Statement of the Case.
MONROE, J.
Defendant prosecutes this appeal from a judgment condemning it to pay plaintiff $2,500, as damages for personal injuries received by him. Plaintiff has answered the appeal, praying for an increase in the award. Plaintiff, a negro boy, past 17 years of age, was employed by defendant to work about its mill; the principal work to which he was assigned being to assist in the unloading of shelled corn from box cars (standing upon a track which runs parallel with the south side of the mill) into a conveyor, consisting of a trough, 16x16 inches, covered with movable planks, and in which was a piece of metal, shaped like an endless, 12-inch augur, revolving rapidly and carrying the grain along; the trough being fastened to the south wall of the mill and extending almost its entire length, of 80 feet, at an elevation of, say, 2 feet from the ground, and passing a few inches below the sills of the doors, opening through the wall, and the south side of the trough being 28 inches from the north side of the cars, as they stood on the track. As the corn was to be unloaded into the conveyor, and was not to pass through the mill doors, the cars were not placed on the track with reference to the doors, and the planks with which the trough was covered were left loose in order that the corn might be conducted by means of a chute, or chutes, from a ear, or from a number of cars, at the same time, placed at any point, or points, along the track. A full load for a car was about 1,000 bushels of shelled corn, and, in addition to doors, midway between the ends and sliding to and fro against the two outer sides, the car was provided with bulkheads, consisting of planks, nailed horizontally, upon the inner sides, across the openings, otherwise closed by the sliding doors. The method of establishing the connection necessary to transfer the corn from the car to the conveyor was to open the conveyor trough by sliding one of the planks by which it was covered over its neighbor, in one direction or the other, in order to let in the end of the chute; to slide back the door of the car, standing opposite, thus affording access to the bulkhead; to saw a hole in the bulkhead, next to floor of the car; and then to place the chute in position,, from the hole in the bulkhead to the conveyor trough, when, as the trough was lower than the hole, the corn, being shoveled into the chute at one end, was carried to the other end and into the trough, by gravitation. And the business of the boy, and of a man who was engaged upon the same job, was to shovel the corn, and keep up the supply in the chute until the car was emptied. The particular car, in which the boy had been working on the day of the accident, was so placed on the track that the door was not opposite to either of the doors of the mill (of which there were two, or, possibly, three, on that side), but was about its own width, or, say, 3 or 4 feet, to the eastward of one of them, so that, in order to reach his place of busi *873 ness by the most convenient route and the route commonly used, under such circumstances, it was necessary for the boy to pass out through the mill door and walk eastward, on the top of the conveyor trough, until he reached a point opposite the bulkhead, in the car, and then to knock off one or more planks from the upper part of the bulkhead and climb into the ear through the opening thus made; and that is what he did. Later in the day, after he had been working in the car for several hours, he needed a drink of water, and he undertook to go back into the mill, in order to get it, over the same route. He climbed, or raised himself, from the inside of the car over the bulkhead, and, holding on to the top with his hands and letting himself down on the outside, attempted to reach, and did reach, the conveyor trough, 28 inches away, by stretching his feet out, backward, and, having thus attained the trough, he let go with his hands. According to his testimony, however (and it is entirely uncontradicted, on that point), the plank, by which the trough had been covered, had been moved from its place, while he was at work in the car, and his feet, finding only the edges of the trough to rest on, slipped into the trough, with the result that, before he could be extricated, all the flesh and muscles of his right leg, from the knee down, including the foot, were practically ground, or churned, off, by the revolving augur, and, after an experience of five or six months’ suffering, he was left crippled for life with a thing, called a leg, dangling from his body,', which is of no use to him, but is in his way, and is likely to be a source of continued suffering.
Opinion.
[1] According to the evidence, it was customary, after removing the covering of the conveyor trough for the accommodation of the end of the chute, to replace it over so much of the trough as was not occupied by the end of the chute; but it can readily be understood that, if the chute reached the trough at a point midway between the ends of a plank six feet long, that particular plank could not be made to cover the space left open on both sides of the chute; and, if it were used for one side, and-the space on the other side were covered by moving up the nearest plank, on that side, there must have been left open the space from which the plank was so moved; and the testimony does not show how that was provided for. In fact, Mr. Senac, who has charge of the mill, and who testifies that he generally warned the employés that the conveyor was dangerous, and gave that warning, specifically, to some of them whom he names (though not to the plaintiff), admits that it is still dangerous, though the condition has been improved by changes made since the accident to plaintiff. It is said that plaintiff was warned by “Ab. Lyons,” another employs; but there is no testimony to that effect. It is also said that he might have gotten out of the car on the south side, that he might have used a ladder, and that he might have realized the dangerous character of the conveyor by seeing it revolve in the trough; and, so he might have done those things; if he had been other than who he was. But he was an ignorant negro boy, who was accustomed to doing as he was told, or, as he saw others doing, and to whom the idea of doing anything else was not likely to occur. He was not told that he might get out on the other side of the car, or might use a ladder, or that he should be careful in putting his foot on the conveyor to see that the top was in its place; and he got in and out of the car as he saw others doing, and as the defendant knew that he and others were doing, and as he had the right to assume was the way provided, or contemplated, by defendant; but which was *875 a bad and a dangerous way. The case, we think, falls within the well-settled principles that the burden rests upon the master to see that the place where the servant is required to do his work, and the ingress and egress thereto and therefrom, are reasonably safe, and are kept so; that it is the duty of the master to instruct and warn the servant, and particularly a minor or other person who may lack experience or intelligence, of the dangers incidental to, or connected with, the service that he is to render; that an ignorant negro boy will not be denied damages for personal injuries sustained in the course of his employment, where it appears that he was acting, when injured, as other employes were accustomed to act, to the knowledge and with the apparent approval of the master, and that no other course, or mode of action, was suggested to him. Paren v. Sellers, 39 La. Ann. 1011, 3 South. 363, 4 Am. St. Rep. 256; Powers v. Calcasieu Sugar Co., 48 La. Ann. 483, 19 South. 455; Budge v. Morgan’s La. R. & Co., 108 La. 349, 32 South. 535, 58 L. R. A. 333; Lindsey v. Lumber Co., 108 La. 468, 32 South. 464, 92 Am. St. Rep. 384; Broadfoot v. Shreveport Cotton Oil Co., 111 La. 467, 35 South. 643; Carter v. Lumber Co., 113 La. 239, 36 South. 952; Burns v. Ruddock-Orleans Cypress Co., 114 La. 247, 38 South. 157; Gracia v. Maestri, etc., 114 La. 371, 38 South. 275; Moses v. Grant Lumber Co., 114 La. 933, 38 South. 684; Smith v. Minden Lumber Co., 114 La. 1035, 38 South. 821; Parker v. Crowell-Spencer Lumber Co., 115 La. 463, 39 South. 445; Brinkman v. St. Landry Cotton Oil Co., 118 La. 835, 43 South. 458; Musearelli v. Hodge Pence & Lumber Co., 120 La. 335, 45 South. 268; McBailey v. Suberbielle, 120 La. 570, 45 South. 442.
[2] In view of plaintiff’s youth, of the fact that he is, and must be, dependent upon his ability to do manual labor for his livelihood, and that he is, to a great extent, deprived of that ability by the injuries that he has sustained; in view of the very great suffering that he has endured, and of the fact that, in addition to being disabled, he is likely to be called on to suffer in the future — we are of opinion that the amount allowed him by the district court is inadequate. It is therefore adjudged and decreed that the judgment appealed from be amended by increasing the amount thereby awarded to $6,000, and, as thus amended, affirmed.